IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Free State of Bavaria, Represented by the University of Würzburg, | : | |
| | : | |
| Plaintiff-Appellant, | : | No. 24AP-515 (Ct. of Cl. No. 2022-00495JD) |
| v. | : | (REGULAR CALENDAR) |
| The Ohio State University, | : | |
| Defendant-Appellee. | : | |

---

D E C I S I O N

Rendered on June 30, 2026

---

**On brief:** *Hahn Loeser & Parks, LLP, Eric B. Levasseur*; *Chiesa, Shahinian & Giantomasi P.C.*, and *Joseph V. Saphia,* pro hac vice, for appellant. **Argued:** *Joseph V. Saphia.*

**On brief:** [*Andy Wilson*], Attorney General, *Mathura J. Sridharan*; *Ice Miller, LLP*, and *Jenny Buchheit*, pro hac vice, for appellee. **Argued:** *Mathura J. Sridharan.*

---

APPEAL from the Court of Claims of Ohio

LELAND, J.

{¶ 1} Plaintiff-appellant, The University of Würzburg ("UW"), appeals from a judgment of the Court of Claims of Ohio in favor of The Ohio State University ("OSU"). For the following reasons, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} UW and OSU were engaged in biomedical research with laboratory mice regarding spinal muscular atrophy ("SMA"), a debilitating disease that causes loss of motor function in children. Survival Motor Neuron ("SMN") genes maintain motor neuron health, and mutations in the genes cause SMA.

{¶ 3} Dr. Michael Sendtner and the UW team developed a mouse without full function of the SMN1 gene, known as the SMN1 Knockout Allele ("Knockout") mouse. At about the same time, Dr. Arthur Burghes and the OSU team engineered a process to insert the SMN2 gene into a mouse. OSU reached out to collaborate with UW, and UW provided its mouse to OSU in 1997 to use in its research. An agreement regarding its use was not reduced to writing at that time.

{¶ 4} In 1999, OSU synthesized the two mice and created the Severe SMA mouse that had full loss of the SMN1 gene but retained use of the new SMN2 gene and exhibited the same physical symptoms as a child with SMA. Drs. Burghes and Sendtner presented the mouse at a SMA conference in June 1999, and it became the first realistic animal model for SMA testing. The two scientists celebrated the success of this new research tool and co-authored two papers. The collaboration was dissolved in 2004 and the institutions pursued independent activity.

{¶ 5} OSU continued its SMA genetic research and developed the SMNDelta 7 ("Delta 7") mouse, which had a much longer life span and displayed a uniform course of the disease. The Delta 7 mouse became the gold standard research tool for SMA research and, in 2004, the SMA Foundation ("SMAF") contacted OSU and negotiated a license for the Delta 7 mouse mice to facilitate broader dissemination in the research community. The SMAF also negotiated a license with UW for the use of the Knockout mouse.

{¶ 6} On April 14, 2005, OSU entered into an agreement with the Jackson Laboratory ("JAX"), a central repository for scientific research animals, whereby JAX would assume distribution of the Delta 7 mouse. Pursuant to the agreement, non-profit and academic institutions are able to use the mice for research purposes without charge, but for-profit entities must seek a license from OSU.

{¶ 7} A team from Nationwide Children's Hospital ("NCH") and OSU, including Dr. Burghes, used the Delta 7 mouse from JAX to create Zoglensma®, a gene therapy

treatment for SMA. NCH and OSU have been compensated for their involvement in the drug's development. Neither Dr. Sendtner nor UW had any involvement in the research or development of Zoglensma®.

{¶ 8} The OSU technology commercialization office ("TCO") negotiates and manages agreements for the use of scientific material owned by OSU. In 2016, a company interested in the Delta 7 mouse requested the TCO clarify UW's interest in the mouse. TCO staff discussed the development of the mouse with Dr. Burghes and realized that UW had an interest in the Delta 7 mouse. The TCO negotiated an Inter-Institutional Agreement ("IIA") with UW in September 2017 to address unremitted fees and govern distribution of future license fees. The IIA had an effective date of April 14, 2005, and required OSU to pay UW a one-time fee of $25,000 to compensate UW for licensing agreements OSU entered into between 2005 and 2017. New commercial entities using the Delta 7 mouse would pay a licensing fee of $80,000 which would be split equally between UW and OSU after a JAX administrative fee was deducted. As of the date of oral argument in this case, UW had refused to accept payment from OSU pursuant to the IIA.

{¶ 9} On June 22, 2022, UW filed a lawsuit against OSU for the unauthorized use of the Delta 7 mouse. UW alleged that OSU misrepresented its ownership interest in the mice to JAX and that OSU fraudulently misrepresented its position during the IIA negotiation resulting in the loss of compensation from licensing fees. The matter proceeded to a bench trial where the court found in favor of OSU on all counts. UW now brings the instant appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 10} UW assigns the following as trial court error:

> [I.] The Court of Claims ("Trial Court") erred when by entering judgment in favor of Defendant-Appellee The Ohio State University ("OSU") and finding that OSU did not breach any fiduciary duty owed to Plaintiff-Appellant Free State of Bavaria, represented by the University of Wurzburg ("UW").

> [II.] The Trial Court erred by entering judgment in favor of OSU and failing to find that OSU committed fraud by concealing and misrepresenting material facts that it had a duty to disclose.

[III.] The Trial Court erred by entering judgment in favor of OSU and failing to find that OSU committed fraud by making false statements for which knowledge of falsity can be inferred.

[IV.] The Trial Court erred by entering judgment in favor of OSU and failing to find that OSU committed constructive fraud.

[V.] The Trial Court erred by entering judgment in favor of OSU and finding that UW's damages claim was speculative.

[VI.] The Trial Court erred by denying UW's motion to apply German law to pre-contractual disclosures.

## III.  STANDARD OF REVIEW

{¶ 11}  In a civil appeal from a bench trial, we apply a manifest weight standard to our review of the factual issues.  *Huntington Natl. Bank v. Miller*, 2016-Ohio-5860, ¶ 13 (10th Dist.).  Judgments supported by competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence.  *Skorvanek v. Ohio Dept. of Rehab. & Corr.*, 2018-Ohio-3870, ¶ 89 (10th Dist.).  We presume the findings of the trial court are correct because the trial judge is best able to observe the witnesses and use those observations in weighing the credibility of the proffered testimony.  *Grove City v. Clark*, 2002-Ohio-4549, ¶ 19 (10th Dist.).  However, purely legal questions are subject to a de novo review.  *MacDonald v. Authentic Invests., L.L.C.*, 2016-Ohio-4640 (10th Dist.).

## IV.  LEGAL ANALYSIS

{¶ 12}  UW argues as its first assignment of error that the trial court erred when it found in favor of OSU on UW's claim for breach of fiduciary duty and determined that it did not have a fiduciary relationship with OSU. UW contends OSU breached a fiduciary duty by representing to JAX that it had the legal right to license the Delta 7 mouse SMA mice and concealing and misrepresenting material facts to entice UW to sign a backdated IIA.

{¶ 13}  A plaintiff bringing a claim for breach of fiduciary duty must prove "(1) the existence of a duty arising from a fiduciary relationship, (2) the defendant's failure to observe the duty, and (3) an injury proximately resulting from the breach." *Santagate v.*

*Pennsylvania Higher Edn. Assistance Agency*, 2020-Ohio-3153, ¶ 31 (10th Dist.).  A fiduciary relationship is necessarily fact specific, and its existence turns on the facts and circumstances of each situation.  *Nazareth Deli, L.L.C. v. John W. Dawson Ins. Inc.*, 2022-Ohio-3994, ¶ 42 (10th Dist.).  The absence of a fiduciary relationship is fatal to a breach-of-fiduciary-duty claim.  *Cristino v. Bur. of Workers' Comp.*, 2012-Ohio-4420, ¶ 16 (10th Dist.).

{¶ 14} A fiduciary is " 'a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.' "  *Advent v. Allstate Ins. Co.*, 2006-Ohio-2743, ¶ 13 (10th Dist.), quoting *Groob v. KeyBank*, 2006-Ohio-1189, ¶ 16.  "A fiduciary owes a duty of loyalty to its principal, requiring the fiduciary to act solely in the best interest of the principal."  *Branson v. Fifth Third Bank, N.A.*, 2025-Ohio-4396, ¶ 72 (1st Dist.).  A fiduciary "may not possess an interest that might conflict with the interest of the person to whom the fiduciary owes a duty."  *Ford v. Brooks*, 2012-Ohio-943, ¶ 11 (10th Dist.).  Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in charge of the fiduciary.  *Alibrando v. Miner*, 2021-Ohio-2827 (5th Dist.).

{¶ 15} In Ohio, a fiduciary relationship is defined as "one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of this special trust." (Internal quotation marks and citations omitted.)  *Simek v. Orthopedic & Neurological Consultants, Inc.*, 2019-Ohio-3901, ¶ 62 (10th Dist.).   It is the " ' "duty to act for someone else's benefit, while subordinating one's personal interests to that of the other person.  It is the highest standard of duty implied by law." ' "  *O'Dell v. Vrable III*, 2022-Ohio-4156, ¶ 69 (4th Dist.), quoting *Elmore v. State Farm Mut. Auto Ins. Co.*, 202 W.Va. 430, 435 (1998), quoting *Black's Law Dictionary* 625 (6th Ed. 1990).  Such a relationship may arise either through a formal agreement or de facto from an informal relationship, but it requires mutual understanding and agreement by both parties that a special trust or confidence has been reposed.  *Aetna Resources, L.L.C. v. Clark*, 2024-Ohio-3003, ¶ 26 (10th Dist.).   Only in rare cases is it reasonable to believe that a party will put another's interest ahead of their own, giving rise to a fiduciary relationship.  *Crestwood Farm Bloodstock v. Everest Stables, Inc.*, 751 F.3d 434, 443 (6th Cir. 2014) (no fiduciary

relationship where horse breeder boarded horses at a thoroughbred farm through various boarding, breeding, and selling agreements and farm had no duty to act primarily for breeder's benefit).

{¶ 16} The burden of proving the existence of a fiduciary relationship lies with the party asserting it. *Burks v. Dayton Pub. School Bd. of Edn.*, 2023-Ohio-1227, ¶ 23 (2d Dist.). Fiduciary relationships are generally not presumed in ordinary business or contractual relationships, and courts have been reluctant to characterize relationships as fiduciary in nature unless there is complete dependence by the inferior party or statutorily imposed duties. *Cook v. Kudlacz*, 2012-Ohio-2999, ¶ 79 (7th Dist.). Merely reposing trust and confidence in another, by itself, does not create a fiduciary relationship. *Hanick v. Ferrara*, 2020-Ohio-5019, ¶ 75 (7th Dist.).

{¶ 17} The duty of confidentiality is often confused with fiduciary duty. "A breach of a duty of confidentiality is separate and distinct from a breach of fiduciary duty." *Groob*, 2006-Ohio-1189, at ¶ 25. The Supreme Court of Ohio noted that a duty of confidentiality "does not create an obligation to act only in its customer's best interest, even to its own detriment, which is what a fiduciary relationship requires." *Id.*

{¶ 18} The record in this case indicates that the OSU and UW collaboration resulted in SMA mice that were in great demand by researchers. Dr. Sendtner wanted his Knockout mice kept at OSU for distribution because the logistics of sending mice from Germany was complicated and burdensome. Dr. Burghes testified that he never distributed the UW Knockout mouse without consent from UW. Institutions provide tangible research material such as mice to research organizations pursuant to a contract known as a material transfer agreement ("MTA"), which documents the chain of custody and defines the terms of use, ownership, and intellectual property rights. OSU suggested the two institutions create a joint MTA, but Dr. Sendtner rejected the proposal and sent the UW MTA with instructions via email:

> I suggest that you give out this file to anybody requesting mice. Otherwise, I could send it out to anybody who wishes to use these mice. In case anybody wishes changes, he or she should contact me and I will direct them to the contract department of our University.
>
> There seem to be problems with Paragraph II.16 (governing law) to some researchers. However, this point is

requested as it stands from German Government, there is
nothing I can do about it (I tried without success).

(Jt. Ex. EE.)  Pursuant to Dr. Sendtner's instructions,  OSU would transfer mice only after the UW MTA had been executed.

{¶ 19} UW's MTA was designed for non-profit institutions engaged in academic research and required a remittance of ten percent of any profit obtained by the non-profit institution's commercial use of the Knockout mice.  This is known as a reach-through provision, where the provider lays financial claim to subsequent activity beyond the contemplated use of the material received.  If the requester is a for-profit entity involved in drug screening or other commercial development, UW required a license for use of the mice.

{¶ 20} Dr. Burghes reached capacity in breeding at OSU and needed to ramp up propagation so the mice could be more widely shared.  As the size of the mouse colony increased, so did the expenses, even though the mice were provided at no cost.  SMAF wanted to accelerate the development of SMA therapies and believed this could be achieved by depositing the mice at JAX which had the capability to increase breeding. SMAF viewed the research as a limited opportunity to attack a rare disorder and sought special carveouts from standard agreements used in more common diseases.  In late 2004 and early 2005, OSU informed SMAF of UW's interest in the mice, and SMAF entered into separate licensing agreements with both institutions.  The licenses were non-exclusive, and OSU and UW maintained their rights to license mice outside of their agreement with SMAF.

{¶ 21} JAX required OSU to complete an intake form upon depositing mice for distribution, and, when asked about any legal restrictions on the distribution of the mice, OSU declared:

> Yes. There are some restrictions on use for commercial purposes currently on the mice.  One concerns the KO allele and the restrictions by university of Wurzburg and german funding agencies.  OSU also currently has similar restrictions. I would like to see no restrictions from the osu end for SMA research but this has to go through the tech transfer office at OSU.

(Jt. Ex. AF.) Dr. Burghes disclosed Dr. Sendtner's contribution and interest in the mice, and JAX documented Dr. Sendtner's involvement in its catalog.

{¶ 22} OSU represented that it had the legal right to license the mice and entered into a non-exclusive license agreement with JAX where non-profit and academic institutions could freely use the mice for research purposes, but for-profit entities had to obtain a license from OSU. JAX was required to determine if the requesting party was a for-profit entity and, if so, must advise the entity to first obtain a license from OSU. In October 2004, JAX added the Knockout, Severe SMA, and the Delta 7 mouse to its inventory.

{¶ 23} Applying the legal framework to the facts of this controversy, we find there exists competent, credible evidence to support the trial court's determination there was no special fiduciary relationship between OSU and UW. Here, as found by the court, the record does not reflect that OSU had any duty to act primarily for UW's benefit. Neither Dr. Sendtner nor Dr. Burghes had authority to enter into an agreement on behalf of their respective universities and certainly could not negotiate the terms of another university's contract. Dr. Burghes and OSU had no authority to act on UW's behalf in the negotiation of transfer agreements and licenses.

{¶ 24} Instead, each university protected its own material and negotiated its own MTAs and commercial licenses. Pursuant to Dr. Sendtner's instructions, OSU would not transfer mice without authority from UW. "Generally, when parties act to protect their own interests and operate at arm's-length from one another, their relationship is not fiduciary in nature." *Carnahan v. SCI Ohio Funeral Servs., Inc.*, 2001 Ohio App. LEXIS 1106, *14 (10th Dist. Mar. 13, 2001).

{¶ 25} UW merely asked OSU to forward its MTA to prospective users but nothing else. Even that duty was non-compulsory, as UW would also send prospective users its MTA. OSU did as requested and sent the UW MTA when dealing directly with prospective users, but had no obligation or duty to take further action. It was not OSU's responsibility to ensure a prospective user complied with the terms, including payment of compensation. If the MTA was not returned, OSU had no ability to act on behalf of UW. Likewise, if commercial use is contemplated, the prospective user must contract directly

with UW to receive a license. The mere action of sending out the UW MTA was not a fiduciary duty but rather an act of convenience.

{¶ 26} UW notes the trial court found the parties acted in good faith with a high degree of honesty and confidence and contends the statement is a textbook definition of a fiduciary relationship. However, one party in a fiduciary relationship must be in a position of superiority or influence over the other, and we find that this second component is notably absent. *Hoyt v. Nationwide Mut. Ins. Co.*, 2005-Ohio-6367, ¶ 34 (10th Dist.). Only when one party figuratively holds all of the cards is a fiduciary relationship established. *First Natl. Bank of Omaha v. iBeam Solutions, L.L.C.*, 2016-Ohio-1182 (10th Dist.). OSU held no cards and did not receive a superior position in the relationship.

{¶ 27} Accepting that UW's evidence demonstrates a special trust or confidence imposed on OSU to forward the UW MTA to prospective users, UW has failed to establish that it communicated any particular trust or confidence to OSU or that OSU acknowledged such. *Nichols v. Schwendeman*, 2007-Ohio-6602, ¶ 21 (10th Dist.). ("Simply put, the record contains no evidence that appellants communicated their alleged special confidence or trust to appellees. Thus . . ., the record does not demonstrate a bilateral understanding, as is necessary to convert an ordinary business relationship into a fiduciary one.").

{¶ 28} UW contends OSU's fiduciary duty was to act primarily for the benefit of UW in matters connected with OSU's undertaking with regard to the use of mice to prospective users. Here, OSU had no duty to act on behalf of UW at all. Nothing about this relationship required OSU to act primarily for the benefit of UW or required OSU to elevate UW's interests over its own. *See Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 2015-Ohio-3716, ¶ 40-44. To the contrary, this was purely a business relationship involving scientific research based on mutual trust. *See In re Sallee*, 286 F.3d 878 (6th Cir. 2002) (long relationship based on trust and confidence alone does not transform arms-length dealing into a fiduciary relationship).

{¶ 29} Two parties can collaborate with honesty, good faith, trust, confidence, and candor without creating a fiduciary relationship. *APCO Industries v. Braun Constr. Group, Inc.*, 2020-Ohio-4762 (10th Dist.). The relationship between the parties and the activities regarding the mice are insufficient to support a legal conclusion that a fiduciary

duty existed here. Accordingly, we conclude the manifest weight of the evidence supports the trial court's determination that UW has not proven by a preponderance of the evidence its breach-of-fiduciary-duty claim. UW's first assignment of error is overruled.

{¶ 30} UW's second, third, and fourth assignments of error allege that OSU committed fraud while the parties were negotiating the IIA, and the sixth assignment of error contends that German law should have been applied to the disclosure element of fraud. Because they are interrelated, we shall consider them together.

{¶ 31} Fraud is an intentional misrepresentation of the truth to deceive another to act to his or her detriment. *Moses v. Sterling Commerce Am., Inc.*, 2002-Ohio-4327, ¶ 15 (10th Dist.). The elements of fraud are (1) a representation or, where there is a duty to disclose, concealment of a fact; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred; (4) with the intent of misleading another into relying upon it; (5) justifiable reliance upon the representation or concealment; and (6) a resulting injury proximately caused by the reliance. *Morrow v. Reminger & Reminger Co., LPA*, 2009-Ohio-2665, ¶ 20 (10th Dist.).

{¶ 32} In order to establish a claim of fraud, it is necessary for a party to prove all of the above elements. *Martin v. Ohio State Univ. Found.*, 139 Ohio App.3d 89, 98 (10th Dist. 2000). While the elements of fraud are cumulative, there is no explicit requirement that they must be addressed in a specific order. *Bench Signs Unlimited v. Stark Area Regional Transit Auth.*, 2004-Ohio-4199, ¶ 24 (9th Dist.). Courts have focused on individual elements, such as intent, when that element is dispositive to the case. *Westfield Ins. Co. v. Huls Am.*, 128 Ohio App.3d 270 (10th Dist. 1998).

{¶ 33} UW argued that OSU had a duty to disclose material information, but David Mess, a manager with OSU's technology commercialization office, concealed its involvement in licensing mice and the successful use of the mice in gene therapy, failed to disclose the real reason for backdating the IIA, and misrepresented that it had only recently become aware of UW's interest in the mice. UW contends that OSU did not disclose its distribution agreement with JAX and misrepresented facts to JAX when it entered into the agreement for the Delta 7 mouse which resulted in JAX failing to forward the UW MTA to prospective users, effectively foreclosing UW's ability to share in any

commercial proceeds from using the mice. UW asserts the false statements, concealments, and misrepresentations were made to entice it to agree to the IIA.

{¶ 34} The first element of fraud is a representation or concealment of a fact. Fraudulent concealment specifically arises when a party fails to disclose material facts that it has a duty to disclose and such non-disclosure induces reliance to the detriment of the other party. *Bryk v. Berry*, 2008-Ohio-2389, ¶ 6 (9th Dist.). A duty to disclose arises when there is a fiduciary or similar relationship of trust and confidence between the parties and one party is obligated to disclose material facts that the other party is entitled to know. *Federated Mgt. Co. v. Coopers & Lybrand*, 137 Ohio App.3d 366, 383 (10th Dist. 2000). OSU did not have a duty to disclose material information based on a fiduciary relationship because in our determination, such a relationship did not exist. *Gen. Elec. Capital Corp. v. Tartan Fields Golf Club, Ltd.*, 2013-Ohio-4875, ¶ 25 (5th Dist.).

{¶ 35} With respect to the third element of fraud, a representation is made with utter disregard and recklessness when the person who makes the representation is careless or indifferent to the consequences or the risk that the representation will cause the person to whom it is made to do or not to do certain things. *Yusko v. Subichin*, 2003-Ohio-7194 (9th Dist.). Under Ohio law, acting with "reckless disregard" in the context of concealing information does not require actual knowledge of the concealed fact but, instead, involves a high degree of awareness of the probable falsity of the information or a conscious disregard of a substantial and unjustifiable risk that the information is false or incomplete. *Tanzillo v. Edwards*, 2007-Ohio-497 (10th Dist.).

{¶ 36} The trial court determined that, while some of Mess's statements were inaccurate or cagey, UW failed to prove that Mess's comments were made with knowledge they were false or with no regard as to whether the comments were true or false, or that the comments were made with the intent of misleading UW to rely on them. All elements of a fraud claim must be present or the claim fails. The court observed Mess's demeanor and found his testimony to be credible in spite of shortcomings. *DC Welch Trucking v. Lagowski*, 2021-Ohio-4555 (7th Dist.).

{¶ 37} In December 2016, OSU reached out to UW to discuss getting an IIA in place, and provided OSU's standard IIA template for review. Dr. Iris Zwirner-Baier, the head of the licensing office at UW, consulted with Dr. Sendtner and responded to OSU with

concerns about SMAFs involvement. Mess replied that the OSU agreement with SMAF had expired, necessitating the need for an IIA. Dr. Zwirner-Baier confirmed UW's intent to reach an agreement and shared concerns from the UW legal department about patent issues and governing law. Mess modified the proposed IIA in light of UW's concerns, and stated that he had just become aware of UW's contribution to the Delta 7 mouse and proposed the IIA have an effective date of April 5, 2005.

{¶ 38} The UW legal team reviewed OSU's draft IIA, and Dr. Zwirner-Baier informed Mess that the backdating remained an issue. Mess informed Dr. Zwirner-Baier that the IIA was backdated the date the mice were first deposited with JAX and became available for commercial licenses. He informed her OSU had entered into license agreements since that time and backdating the IIA was to cover any unpaid licensing fees, and that if UW had a suggestion of how to bridge the time period, please let him know.

{¶ 39} UW did not offer any specific recommendations but, instead, requested OSU pay $25,000 as a friendship price for unpaid licensing fees for the period between 2005 and 2017. Dr. Zwirner-Baier requested which companies received a license from OSU, but Mess incorrectly stated he could not disclose the names due to confidentiality provisions. Mess testified that he did not provide the identities because he was concerned that confidential disclosure agreements prevented release of the information. Mess did provide UW the number of licenses granted and associated fees associated with the licenses prior to UW executing the IIA in September 2017. The trial court found UW failed to prove that Mess made false statements or acted recklessly.

{¶ 40} The parties spent eight months negotiating the IIA. The record indicates lengthy lapses before Dr. Zwirner-Baier would respond and it appeared Mess was trying to move the process along instead of pressing UW to sign the agreement. There is no evidence she was rushed through the negotiations or prevented from asking questions about the IIA terms. UW properly exercised due diligence before it signed the agreement.

{¶ 41} We note UW argued that OSU engaged in fraud through misrepresentations made to JAX. "It is well-established law in Ohio that a fraud claim may not be based on a misrepresentation made to a third party," and the elements of fraud must be directed against the alleged victim. *Wiles v. Miller*, 2013-Ohio-3625, ¶ 37 (10th Dist.). A party cannot maintain an action for fraud when fraudulent representations were not made to

him to induce him to act. *Moses.*, 2002-Ohio-4327, (10th Dist.). A plaintiff fails to state a valid cause of action for fraud when he alleges that a third-party relied on misrepresentations made by a defendant and that he suffered injury from that third-party's reliance. *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 7.

{¶ 42} UW also made an allegation that OSU engaged in constructive fraud which we have defined as "a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests." (Internal quotation marks and citations omitted.) *L&N Partnership v. Lakeside Forest Assn.*, 2009-Ohio-2987, ¶ 49 (10th Dist.). An action for constructive fraud is based on the "failure to disclose facts of a material nature where there exists a duty to speak." (Internal quotation marks and citation omitted.) *Baughman v. State Farm Mut. Auto Ins. Co.*, 2005-Ohio-6980, ¶ 12 (9th Dist.).

{¶ 43} Proof of fraudulent intent is not required, and the law relating to constructive fraud assumes fraud to protect significant social interests when parties have a special fiduciary or confidential relationship which places one party in a position to take an unfair advantage over another. *Camp St. Mary's Assn. of the W. Ohio Conference of United Methodist Church, Inc. v. Otterbein Homes*, 2008-Ohio-1490, ¶ 22 (3d Dist.). However, we must circle back to our finding that no fiduciary or confidential relationship existed to support a claim of constructive fraud, and this claim is extinguished.

{¶ 44} UW contends that OSU had a duty to disclose material facts during the IIA negotiation under German law and that the trial court erred by not considering choice-of-law factors. However, UW provides no legal argument to this claim, and merely refers to arguments made in a motion. A party must affirmatively demonstrate error on appeal and may not simply incorporate arguments made in the trial court and fail to cite any legal authority applicable to the facts. *McNeilan v. Ohio State Univ. Med. Ctr.*, 2011-Ohio-678, ¶ 7 (10th Dist.). "It is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error." *Abraham v. BP Exploration & Oil, Inc.*, 2002-Ohio-4392, ¶ 32 (10th Dist.). UW has not developed an argument in support of its sixth assignment of error, and therefore has not demonstrated error on appeal. *Taneff v. Lipka*, 2019-Ohio-887 (10th Dist.).

{¶ 45} The trial court observed the demeanor and credibility of the witnesses and found that the claim of fraud failed.   Our review of the record confirms the same, and we conclude the manifest weight of the evidence supports the court's finding that UW has not proven their fraud claim by clear and convincing evidence.  UW's second, third, fourth, and sixth assignments of error are overruled.

{¶ 46} UW asserts in its fifth assignment of error that the trial court erred when it found that UW's damages claims were speculative.  As a subset of that argument, UW claims the trial court erred in admitting Amy Roscoe's, vice president for research administration and operations at the Abigail Wexner Research Institute ("Research Institute"), NCH's pediatric research center, testimony because it was too speculative and not based on her own perception and personal knowledge.  Pursuant to Evid.R. 701, "[i]f [a] witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." A court has discretion in deciding whether to admit or exclude evidence under Evid.R. 701. *Raymond v. Raymond*, 2011-Ohio-6173, ¶ 6 (10th Dist.).  A reviewing court will not disturb a ruling on admissible evidence unless the trial court has abused its discretion. *State v. Phelps*, 2015-Ohio-539, ¶ 27 (10th Dist.); *State v. Angus*, 2006-Ohio-4455, ¶ 16 (10th Dist.)

{¶ 47} UW asserts that NCH was never presented with the UW MTA because OSU misrepresented its ownership in the Delta 7 mouse and NCH obtained the mice directly from JAX without signing a UW MTA.  UW's claim is premised on the assumption that NCH would have unconditionally signed the UW MTA and agreed to pay a fee for the commercial use of the Delta 7 mouse.  Damages that are based on speculation are not recoverable. *Gahanna v. Eastgate Properties*, 36 Ohio St.3d 65, 68 (1988).  "An award of damages must be shown with a reasonable degree of certainty and in some other manner other than mere speculation, conjecture, or surmise." *Elias v. Gammel*, 2004-Ohio-3464, ¶ 25 (8th Dist.).

{¶ 48} Roscoe testified that as a non-profit organization, NCH does not engage in commercial terms in MTAs, and would not enter into an agreement  with a commercial reach-through provision.  NCH policy was that commercial terms were reserved for

licenses. Roscoe reviewed all MTAs submitted to NCH from 2006 to 2008, the time frame in question here, and could not locate a single MTA with a commercial profits reach-through provision. Roscoe was shown a UW MTA that was never presented to NCH and repeatedly emphasized that the commercial reach-through clause was unclear, and she would have struck it for vagueness.

{¶ 49} Roscoe's testimony was based on NCH policy and her own experience, not mere speculation. She was familiar with NCH's operation, and her opinion was based on personal involvement with NCH agreements and licenses. Roscoe joined the Research Institute in 2006 and served as manager of business development and licensing until 2008. Roscoe later served as vice president for strategic planning and finance and managed people with authority to sign MTAs. A description of her job duties at the Research Institute allowed an inference that she was in a position to know and understand NCH's business practices.

{¶ 50} In its argument that NCH would have accepted its MTA with a commercial clause, Roscoe was shown a UW MTA signed by NCH in 2017 with a provision stating the agreement is governed by German law. UW argues Roscoe's opinion about what NCH would not do lacks credibility because she also testified it was against NCH institutional policy to sign an MTA governed by foreign law yet they had signed the 2017 provision. UW misstates Roscoe's testimony. Roscoe testified that it is not customary to agree to law outside of the United States and that it would have been the first time that NCH agreed to a foreign law governing a material transfer agreement. Roscoe further testified that it is only a preference not to accept a foreign law provision and not a formal written policy.

{¶ 51} The trial court found Roscoe's testimony was both rationally based on her own perceptions and helpful to its determination of a fact in issue and therefore admissible. *Hetzer-Young v. Elano Corp.*, 2016-Ohio-3356, ¶ 42 (2d Dist.). The trial court gave Roscoe's testimony the proper weight, and no abuse of discretion occurred.

{¶ 52} UW argued, without proof, that if a researcher needs a particular material, the recipient institution will automatically execute the providing institution's MTA, regardless of its terms. Dr. Sendtner stated that if the material is unique, other conditions may be accepted to receive the material.

{¶ 53} A primary basis for UW's argument was prior research at the University of Florida ("UF"), where Kevin Foust worked as a graduate student. Foust requested Dr. Sendtner's Knockout mouse model from UW and UF signed an MTA with a ten percent commercial profits clause. Several years later, NCH, where now Dr. Foust works, requested the Delta 7 mouse from JAX. UW contends, in an exaggerated chain of reasoning, that because UF signed UW's MTA with a commercial profits clause to access the mouse model, NCH will do the same, now that Foust is employed at NCH.

{¶ 54} The fact that UF—an entirely separate institution with different governing policies—agreed to a commercial clause is of little relevance here. There is no logical extension that NCH would have signed the UW MTA just because UF did. Both schools conduct SMA research, but the methodologies were different, as were their policies and procedures. UW's argument calls for improper speculation.

{¶ 56} UW makes broad, sweeping statements and contends, in the absence of any proof, that NCH would have agreed to its terms to gain possession of the Delta 7 mouse model regardless of whether it had been presented with the profit clause. But the record indicates that NCH opposed such a clause and would have opposed this one had it been presented. The trial court heard the testimony and arrived at its decision after weighing the evidence. Based on our review of the record, we do not find a reason to question the court's characterization of UW's damage claim as speculative. As such, we find the court did not abuse its discretion and the decision is not against the manifest weight of the evidence.

{¶ 57} We find that the evidence does not support UW's claims for damages. UW's fifth assignment of error is overruled.

## V. CONCLUSION

{¶ 58} Having overruled all six of UW's assignments of error, the judgment of the Court of Claims of Ohio is affirmed.

*Judgment affirmed.*

EDELSTEIN and DINGUS, JJ., concur.

_____